**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 16, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

SAMUEL D. DRINKERT,

    Petitioner - Appellant,

v.

COLONEL KEVIN PAYNE,*

    Respondent - Appellee.

No. 22-3208

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:22-CV-03045-JWL)**
_____

Submitted on the briefs: **

Robert Feldmeier, The Law Offices of Robert Feldmeier, Raleigh, North Carolina for Petitioner - Appellant.

Jared S. Maag, Assistant United States Attorney (Duston J. Slinkard and James A. Brown with him on the briefs), District of Kansas, Topeka, Kansas, for Respondent - Appellee.
_____

Before **HARTZ**, **TYMKOVICH**, and **ROSSMAN**, Circuit Judges.
_____

    * Pursuant to Fed. R. App. P. 43(c)(2), Michael Johnston, is replaced by Kevin Payne as the Commandant, United States Disciplinary Barracks, Ft. Leavenworth, Kansas. Appellee's motion to substitute party is granted.

    ** After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

_____

**HARTZ**, Circuit Judge.

_____

Petitioner Samuel Drinkert appeals from the denial by the United States District Court for the District of Kansas of his application for a writ of habeas corpus filed under 28 U.S.C. § 2241. He challenges his convictions by a court martial for violations of the Uniform Code of Military Justice, arguing that the military courts improperly admitted prior consistent statements by one of his alleged sexual-assault victims. We agree with the district court that he is not entitled to relief.

## I.    BACKGROUND

We adopt the following summary of the relevant facts by the United States Navy-Marine Corps Court of Criminal Appeals (NMCCA):

> [Mr. Drinkert]'s convictions arise out of separate incidents involving two victims, his brother's ex-girlfriend, [Ms. F.], and a co-worker, [Ms. W.].
>
> . . .
>
> The incidents involving [Ms. W.] occurred . . . in March and April 2018 at [Mr. Drinkert's] residence, where [Ms. W.], a co-worker and friend of [Mr. Drinkert], spent a significant amount of time due to her unstable housing situation. On 30 March 2018, [Mr. Drinkert], [Ms. W.], and a mutual friend were at the house consuming alcohol and socializing. [Ms. W.] became sleepy and woke up the next morning in [Mr. Drinkert]'s bed (when he brought her breakfast). On 3 April 2018, [Ms. W.] and [Mr. Drinkert] were again at [Mr. Drinkert]'s residence drinking and socializing. [Ms. W.] eventually became tired and went to bed. While her memory became hazy, she recalled being in [Mr. Drinkert]'s bedroom prior to falling asleep and awoke early the next morning with [Mr. Drinkert]'s penis inside her vagina. She feigned being asleep while [Mr. Drinkert] ejaculated inside of her, cleaned her with baby wipes, put her underwear on, and left for work. When [Ms. W.] confronted [Mr. Drinkert] about the incident a few days later over a messaging application, and told him she was avoiding him because "[y]ou

Page **2**

raped me," [Mr. Drinkert] initially replied, "What?" and "You don't remember do you?" She then told him she did remember, including that he had "baby wipe [sic] and put everything back how it was," that he was "wrong," and that she did not want to see him again, to which [Mr. Drinkert] responded, "I understand."

On 16 April 2018, after [Ms. W.] had provided a statement to the Naval Criminal Investigative Service [NCIS] alleging that [Mr. Drinkert] had sexually assaulted her on 30 March and 4 April, five Virginia Beach Police officers with the assistance of two NCIS agents executed a civilian search warrant at [Mr. Drinkert]'s residence. The warrant permitted law enforcement to search for and seize evidence to include "cellular phone / electronics which can take photographs an[d] any media storage devices, to include USB, disks, tablets, laptop and desktop computers." The search warrant did not authorize searching [Mr. Drinkert]'s person.

. . .

A forensic review of the phone revealed photographs taken on 3 April 2018, to include one depicting a finger penetrating [Ms. W.]'s vagina. There was another photo of [Ms. W.] while she appeared to be asleep, a photo of [Ms. W.] topless, and search terms related to [Ms. W.]. Pursuant to the search warrant, law enforcement also seized [Mr. Drinkert]'s laptop computer. The forensic review of the computer revealed the same photographs, as well as search terms related to [Ms. W.]. Evidence existing on the phone, but not the computer, included a specific search for "[Ms. W.] naked," as well as searches related to whether one could get pregnant on birth control. All the other evidence from the laptop computer, to include the digital penetration photo, contained metadata which showed the time and location where the photos were taken, as well as the device used to take them.

Supp. App., Vol. I at 102–05 (footnotes omitted). At trial the military judge admitted

testimony of prior consistent statements made by Ms. W. As described by the NMCCA:

After the sexual assault, [Ms. W.] petitioned the City of Virginia Beach for a civilian protective order against [Mr. Drinkert], where she was placed under oath and asked questions. At trial, after her testimony in the Government's case-in-chief, [Mr. Drinkert]'s trial defense counsel cross-examined her about the addition of facts to her testimony at trial that were not included in her testimony at the protective order hearing, implying [Ms. W.] fabricated portions of her testimony at trial. After [Ms. W.]'s testimony, the Government called as a witness Construction Mechanic Third Class [CM3]

Page **3**

Juliet, a former co-worker and roommate of [Ms. W.]. Over trial defense counsel's objection, CM3 Juliet was permitted to testify about [Ms. W.]'s statements to him about the sexual assaults approximately three weeks before the civilian protective order hearing that were consistent with her trial testimony. The military judge found that the testimony was permissible and could be admitted as a prior consistent statement to rebut the express or implied charge of recent fabrication, influence or motive under Mil. R. Evid. 801(d)(l)(B)(i) and to rehabilitate [Ms. W.]'s credibility as a witness when attacked on another ground under Mil. R. Evid. 80l(d)(l)(B)(ii).[2]

*Id.* at 115–16.

Mr. Drinkert was convicted on three specifications of sexual assault and one specification of indecent video recording. He appealed his convictions to the NMCCA. Among the issues he raised was the one issue he pursues in his habeas proceeding—the propriety of the admission of prior consistent statements by Ms. W. Affirming his conviction, the military appellate court ruled that the prior statements were admissible under Military Rules of Evidence 801(d)(l)(B)(i) and (ii). Since satisfaction of either rule

---

[2] Mil. R. Evid. 801(d)(1) states:

(d) Statements that Are Not Hearsay
    A statement that meets the following conditions is not hearsay:
    (1) *A Declarant-Witness' Prior Statement*. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:
        (A) is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition;
        (B) is consistent with the declarant's testimony and is offered:
            (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or
            (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground . . . .

would suffice for affirmance, we need address only the court's discussion of

801(d)(l)(B)(i):

> [Mr. Drinkert] challenged [Ms. W.'s] recollection of events under a theory that [Ms. W.] was too intoxicated to remember what happened and therefore fabricated her statements and testimony during the investigation and that any testimony based on her recollection lacked credibility. Regarding the allegation of recent fabrication, the military judge took note that trial defense counsel's cross-examination of [Ms. W.] focused on differences between her testimony at a civilian protective order hearing and her testimony at trial, which implied that she developed a motive to fabricate sometime after the civilian hearing. The prior consistent statements that were admitted by the military judge were made to CM3 Juliet approximately three weeks before the civilian hearing. The statements were thus offered to rebut an express or implied charge of recent fabrication or improper motive and preceded any motive to fabricate or improperly influence, thus satisfying the requirements of Mil. R. Evid. 801(d)(l)(B)(i) . . . .

*Id.* at 116–17 (footnotes omitted).

Mr. Drinkert unsuccessfully pursued habeas relief in federal district court. On appeal to this court, he argues only that he is entitled to reversal of his court-martial convictions because of the admission of the prior statements by Ms. W.

## II.    DISCUSSION

Both in his military appeal and in this court, Mr. Drinkert has argued that the military judge misapplied the Military Rules of Evidence. He contends that during cross-examination of Ms. W. at trial the focus was on establishing that her purported recollection of events was false because she had suffered an alcohol-induced blackout, not that she fabricated her testimony or had an improper motive; that is, the "defense theme was of mis-recorded memory, not of motive to fabricate." Aplt. Br. at 16. In the alternative he contends that Ms. W.'s statements were inadmissible because she made the

prior consistent statements several days after the blackout and an admissible prior consistent statement must be made before the motive to fabricate or improper influence arose. As we proceed to explain, however, Mr. Drinkert has failed to establish that he is entitled to have us review whether the NMCCA correctly interpreted the Military Rules of Evidence.

When reviewing a military conviction on a habeas petition, "[t]he limited function of the civil court is to determine whether the military have given fair consideration to each of the petitioner's claims." *Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670 (10th Cir. 2010). A merits review is warranted only if the petitioner shows that "the military tribunals failed to consider his claims fully and fairly." *Santucci v. Commandant, U.S. Disciplinary Barracks*, 66 F.4th 844, 852 (10th Cir. 2023); *accord Roberts v. Callahan*, 321 F.3d 994, 996 (10th Cir. 2003) ("[W]here an allegation has been fully and fairly considered by the military courts, the federal civil courts may not review the merits.").

When we say that a military court has fully and fairly considered an issue, we are not saying that we agree with the court's reasoning. Indeed, we ordinarily focus only on how the issue was presented to the military court, without considering that court's reasoning, or even its conclusion. *See, e.g.*, *Thomas*, 625 F.3d at 671 ("[W]hen an issue is briefed and argued before a military board of review, we have held that the military tribunal has given the claim fair consideration, even though its opinion summarily disposed of the issue with the mere statement that it did not consider the issue meritorious or requiring discussion." (internal quotation marks omitted)); *Roberts*, 321 F.3d at 997

Page **6**

(deciding, without any reference to the military court's opinion, that petitioner's grounds for relief were fully and fairly considered because the petitioner "made well-reasoned arguments, cited proper legal authority and identified proper legal standards" in arguing each ground before the military courts); *King v. Moseley*, 430 F.2d 732, 735 (10th Cir. 1970) ("We must hold that the record shows that there was a fair consideration of this constitutional claim by the military upon full presentation of the facts and law . . . so that we cannot review the issue here. . . . The appellant asserts that the military courts and boards reached the wrong result. But again in view of the way in which the case reaches us, this is not for us to evaluate."). *But cf. Dodson v. Zelez*, 917 F.2d 1250, 1253 (10th Cir. 1990) (military court's summarily affirming without discussion was a factor in determining that habeas review was proper).

In this case Mr. Drinkert received full and fair consideration in his military-court appeal on the question of the admissibility of Ms. W.'s prior consistent statements. He thoroughly briefed the issue, arguing that they were not admissible under either of two rules that treat certain prior consistent statements as nonhearsay. *See* Mil. R. Evid. 801(d)(1)(B)(i) and (ii). And the NMCCA thoroughly responded in holding that Ms. W.'s prior consistent statements were properly admitted.

Mr. Drinkert relies on the following four-part test (which we have called the *Dodson* test) that this circuit has adopted to assist in determining whether a claim was fully and fairly considered by the military and therefore is not entitled to habeas review in civil courts:

Page **7**

> [O]ur review of a military conviction is appropriate only if the following four conditions are met: (1) the asserted error is of substantial constitutional dimension, (2) the issue is one of law rather than disputed fact, (3) no military considerations warrant a different treatment of constitutional claims, and (4) the military courts failed to give adequate consideration to the issues involved or failed to apply proper legal standards.

*Thomas*, 625 F.3d at 670–71 (citing *Dodson*, 917 F.2d at 1252–53). We have said that this test "merely develops our understanding of full and fair consideration; it does not add an additional jurisdictional hurdle." *Roberts*, 321 F.3d at 997.

Application of the *Dodson* test, however, does not help Mr. Drinkert. As we said in *Santucci*, "[S]atisfaction of each factor is . . . critical to the invocation of our merits review." 66 F.4th at 858. That is, we cannot grant such review even if just one of the *Dodson* factors is unfavorable to the petitioner. *See Thomas*, 625 F.3d at 670–71; *Santucci*, 66 F.4th at 858. Yet here, three of the four are not satisfied.

First, although Mr. Drinkert contends that "[t]he improper admission of hearsay implicates his due process rights," Aplt. Br. at 15, "the asserted error is [not] of substantial constitutional dimension," *Thomas*, 625 F.3d at 670. In the court-martial proceedings he did not invoke any constitutional objection to the prior consistent statements; and, in any event, "evidentiary determinations ordinarily do not present federal constitutional issues" except where the challenged ruling "unfairly . . . prevent[ed] a defendant from presenting evidence . . . critical to his defense." *Romano v. Gibson*, 239 F.3d 1156, 1166 (10th Cir. 2001); *see also Wilson v. Sirmons*, 536 F.3d 1064, 1101 (10th Cir. 2008) ("Absent a showing that the admission of the evidence violated a specific constitutional guarantee, a federal court on habeas review will not

disturb the state court's evidentiary ruling unless it was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." (internal quotation marks omitted)). The admission of prior statements by a witness who testified at trial, even if not permitted under the rules of evidence, did not render the trial fundamentally unfair.

Second, the admissibility issue was not one of pure law. Mr. Drinkert's chief complaint about the NMCCA opinion is that it rests on misconstruing the implications of his cross-examination of the witness, an issue that is more factual than legal.

Third, Mr. Drinkert has not shown that "the military courts failed to give adequate consideration to the issues involved or failed to apply proper legal standards." *Thomas*, 625 F.3d at 671. He wisely does not press an argument that the NMCCA failed to give adequate consideration to the admission of prior statements. The military appeals court fully confronted his arguments. Rather, he claims that the court did not apply proper legal standards. He does not dispute that the Military Rules of Evidence governed the admissibility of the prior statements. But he argues that those rules were improperly applied. He contends that "[a] civilian court cannot determine whether the military courts 'failed to apply proper legal standards' if it fails to determine whether the military courts' decisions were informed by an erroneous view of the law," Aplt. Br. at 14 (quoting *Dodson*, 917 F.2d at 1252–53); and, in his view, the district court therefore erred in not considering "whether the [military appellate court's] view of the law was correct," *id.* at 15. The government does not challenge Mr. Drinkert's formulation of what is required to satisfy the fourth *Dodson* factor and focuses solely on whether the military courts

properly applied the Military Rules of Evidence. We take this opportunity to correct the parties' threshold misunderstanding of the fourth *Dodson* factor.

To begin with, it would be contrary to our precedents to interpret the "apply proper legal standards" language to require that we assess the merits of the habeas claim (that is, assess whether the governing law was properly applied in the court-martial proceedings) in determining whether we should review it. As discussed above, "where an allegation has been fully and fairly considered by the military courts, the federal civil courts may not review the merits," *Roberts*, 321 F.3d at 996; and the *Dodson* test is simply a useful tool for determining whether an issue has been fully and fairly considered. It would make no sense to interpret *Dodson* to say that we need to assess the merits to determine whether to review the merits.

This does not mean that the apply-proper-legal-standards language has no content. We just need to distinguish between failure to apply the proper standard and incorrectly applying that standard. Unfortunately, there has been no occasion for this court to make that point in our court-martial precedents. In particular, *Dodson* itself did not define *apply proper legal standards*; and it held only that the fourth factor was satisfied in that case because the military court affirmed the conviction summarily without discussion, which addresses the adequate-consideration component of the fourth test, rather than the apply-proper-legal-standards component. *See Dodson*, 917 F.2d at 1253.

But we are not without cues to the meaning of this undefined term. *Dodson*'s four-part test was adopted from the Fifth Circuit opinion in the notorious case (not notorious opinion) of *Calley v. Callaway*, 519 F.2d 184 (1975). In support of the apply-proper-

Page **10**

legal-standards requirement, *Calley* cited (unfortunately without any parenthetical explanation) only one page of one opinion: *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). *See* 519 F.2d at 203. And on that page of its opinion the Supreme Court held that a court would act improperly if it upheld an agency's action by determining that the action could have been justified on a ground that the agency did not state. (*Chenery* is generally cited for the proposition that a court can affirm an agency decision only on a ground expressly relied on by the agency.) Although the Supreme Court did not use the term *legal standard*, it was establishing a legal standard under which courts should review agency action. By citing that part of *Chenery*, the *Calley* court was indicating that failure to comply with the *Chenery* limitation on review of agency action would be an example of a failure to "apply proper legal standards." The cited passage from *Chenery* would have been a peculiar example for *Calley* to use if the Fifth Circuit was trying to convey that "apply proper legal standards" meant "apply legal standards properly," since almost any appellate opinion would exemplify review of whether the law was properly applied.

The distinction between failing to apply the proper standard and applying the proper standard incorrectly is well established in the habeas context, where 28 U.S.C. § 2254(d)(1) distinguishes between a decision "that was contrary to" clearly established law and a decision that "involved an unreasonable application of" clearly established law. The Supreme Court has explained:

> [The] "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court *applies a rule different from the*

Page **11**

*governing law* set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but *unreasonably applies it* to the facts of the particular case.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (emphasis added and citations omitted); *see Murphy v. Royal*, 875 F.3d 896, 914 (10th Cir. 2017) ("If the state court identifies and applies the correct legal rule, its decision will not be 'contrary to' federal law, but the state court's application of the correct rule can still be evaluated under § 2254(d)(1)'s 'unreasonable application' clause." (further internal quotation marks omitted)), *aff'd sub nom. Sharp v. Murphy*, 140 S. Ct. 2412 (2020).

Most pertinent to this case, it is not uncommon to speak in terms of "legal standard" when describing the "contrary to" clause. *See, e.g.*, *Price v. Vincent*, 538 U.S. 634, 640 (2003) (Habeas relief was not warranted under the "contrary to" clause of 28 U.S.C. § 2254 because "[n]owhere did the Michigan Supreme Court apply a *legal standard* contrary to those set forth in our cases. Nor did that court confront a set of facts materially indistinguishable from those presented in any of this Court's clearly established precedents." (emphasis added)); *Eizember v. Trammell*, 803 F.3d 1129, 1140 (10th Cir. 2015) (Gorsuch, J.) ("The Supreme Court has long recognized that a state court's identification of the correct governing *legal standard* and the reasonableness of its application of that standard to the facts are two distinct statutory inquiries." (emphasis added)). We think the "apply proper legal standards" component of the *Dodson* test is using that language in the same sense.

The NMCCA applied the proper legal standard—the Military Rules of Evidence—in resolving Mr. Drinkert's appeal. His complaint is that it did not properly apply the standard. But that is irrelevant to the *Dodson* test.

We conclude that habeas relief is inappropriate.

### III.    CONCLUSION

We **AFFIRM** the judgment below.